




UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- X

SERGEI CHEPILKO,

                Plaintiff,

   -against-

THE CITY OF NEW YORK, LAWRENCE MAJOR,
ANDREW HOWELL, PEP OFFICER MARQUES, PEP
OFFICER ROSE, GLENN KENNEDY, THOMAS
BURNS, VINCENT ROSANELLI, WILLIAM DAVIS,
DARRELL HAYES, and FAMUR CANI, individually and
in their official capacities,

                Defendants.

-------------------------------------------------------------------- X

06-CV-5491 (ARR) (LB)

NOT FOR PRINT OR
ELECTRONIC
PUBLICATION

OPINION & ORDER

ROSS, United States District Judge:

      Sergei Chepilko brings this action pursuant to 42 U.S.C. § 1983 against the City of New York (the "City"), Parks Manager Laurence Major, and other officers of the New York City Department of Parks and Recreation ("Parks Department") and the New York City Police Department ("NYPD"). He seeks to hold defendants liable for physical injuries and violations of his constitutional rights during and immediately subsequent to an altercation he had with Major on Coney Island Beach in Brooklyn on July 2, 2005. Now before the court is defendants' renewed motion for partial summary judgment. For the reasons set forth below, defendants' renewed motion is granted in part and denied in part.

## I. BACKGROUND

      In a previous order and opinion dated July 18, 2010, this court granted defendants' motion for summary judgment with respect to all claims against defendants Marques, Rose, Hayes, Cani and Howell, and with respect to plaintiff's claims for malicious abuse of process,

1

intentional infliction of emotional distress and negligent hiring. The court noted that despite purporting to move against these claims, defendants failed to address (1) plaintiff's theory that 56 R.C.N.Y. § 1-05(b) constituted a municipal policy upon which § 1983 municipal liability may be based under <u>Monell v. Dep't of Soc. Servs.</u>, 436 U.S. 658 (1978), (2) plaintiff's claim for false arrest as to the period of time he was confined in handcuffs but before defendant Major had related the circumstances of the incident to the arresting police officers, (3) plaintiff's claim that defendants' failed to intervene to prevent his arrest absent probable cause, and (4) plaintiff's claims under the Fifth and Eighth Amendments. The court therefore denied in part defendants' motion for summary judgment without prejudice to renewal. In their renewed motion for summary judgment, defendants now move against these claims.

For the purposes of the instant opinion, the court assumes familiarity with its July 18, 2011 order and opinion. <u>See</u> Dkt. No. 129. The court therefore will summarize only briefly those portions of the opinion and facts relevant to the determination of the instant motion.

A. <u>The Incident</u>

On July 2, 2005, Sergei Chepilko, plaintiff, was walking along the crowded Coney Island Beach. Chepilko carried with him a digital camera, a portable printer, and a plastic placard displaying photographs. Along with his equipment, plaintiff carried on his person a copy of the 2001 permanent injunction issued by Judge McKenna in <u>Lederman v. Giuliani</u>, No. 98-CV-2400 (LMM), Dkt. No. 59 (S.D.N.Y. Aug. 24, 2001), which prohibited the City from enforcing its permit requirements against vendors of expressive matter, including photographs, on any territory within the jurisdiction of the Parks Department. Chepilko Dep. at 55-56; Modafferi Aff. Ex. D.

2

As plaintiff was walking along the beach, defendant Laurence Major, a Parks Manager, approached him to prevent him from selling photographs. Chepilko Dep. at 54; Affidavit of Laurence Major, dated Nov. 18, 2010 ("Major Aff.") ¶ 6. What transpired next is the subject of dispute, but somehow an altercation arose and the two men came to blows. During the struggle, Major's hand was cut and Major threw plaintiff to the ground, allegedly injuring plaintiff's knee. Major Aff. ¶ 25-26, 32-33; Chepilko Dep. at 57; Chepilko Aff. at 1. No other Parks Department or NYPD officers were on the scene when the altercation began. Chepilko Dep. at 112. After the initial scuffle, however, Major radioed for police assistance and plaintiff dialed 911 on a borrowed cell phone. Major Aff. ¶¶ 27-28; Chepilko Dep. at 57-58. Officers arrived within minutes, among them defendants William Davis, Sergeant Vincent Rosanelli, Lieutenant Glenn Kennedy, and Captain Thomas Burns, all of the NYPD.

According to plaintiff, "around a dozen" police officers arrived on the scene at the same time. Chepilko Dep. at 58; Chepilko Aff. at 1. The individual defendants recall arriving at different times. Plaintiff agrees with defendants only that Howell arrived later than the first NYPD officers. Chepilko Aff. at 1; Affidavit of Andrew Howell, dated Nov. 17, 2010 ("Howell Aff.") ¶¶ 3-5. Shortly after the NYPD officers arrived, one of them placed plaintiff in handcuffs. Chepilko Aff. at 1. Plaintiff identifies Rosanelli as the officer who handcuffed him "without any warning or explanation," but Davis reports having himself handcuffed plaintiff upon the order of an unnamed superior officer. Chepilko Dep. at 59; Affidavit of William Davis, dated Nov. 21, 2010 ("Davis Aff.") ¶ 7-9. According to Major, plaintiff was placed into handcuffs because he "began to act aggressively." Major Aff. ¶ 31.

At some point—the parties dispute whether this was before or after plaintiff was handcuffed—Major related his version of the altercation to the officers who had arrived,

including Howell, Kennedy, and, later, Burns.  Major Aff. ¶¶ 32-33, 36; Howell Aff. ¶¶ 8-9; Affidavit of Glenn Kennedy, dated Nov. 19, 2010 ("Kennedy Aff.") ¶ 7-8; Burns Aff. ¶ 5.  Major told Kennedy that he wished to press charges against plaintiff.  Kennedy Aff. ¶ 8; Howell Aff. ¶ 9.  At around this time, both Howell and Kennedy noticed that Major's hand was bleeding.  Howell Aff. ¶ 8; Kennedy Aff. ¶ 6.  According to Howell, Kennedy decided that "it should be a Parks Department arrest," so Howell was assigned as the arresting officer.  Howell Aff. ¶ 10.

Plaintiff requested medical attention for his knee and was transported by ambulance to Coney Island Hospital, accompanied by Davis.  Davis Aff. ¶ 12-15.  From the hospital, plaintiff went to the 60th Precinct, where he was given a bottle of water and homemade sandwich and stayed overnight.  Chepilko Aff. at 1-2.  Plaintiff alleges that defendants seized but failed to return the memory cards from his camera which contained evidence concerning the incident.  Am. Compl. at ¶¶26-27.  The following day, July 3, 2005, Parks Department officers Howell, Rose, and Marques took plaintiff to Central Booking at the Brooklyn Criminal Court.  See Chepilko Aff. at 2; Chepilko Dep. at 127; Howell Aff. ¶¶ 19-21.  At Central Booking, plaintiff requested a bottle of water but was given only "unboiled" tap water.  The Kings County District Attorney's Office declined to prosecute, and plaintiff was released that night.  Chepilko Aff. at 2; Modafferi Aff., Ex. O (declined prosecution form).

B. City Rules

As background, prior to revisions in July 2010, Section 1-05(b) of the Title 56 of the Rules of the City of New York required all vendors operating on Parks territory to obtain a permit:

> No person in any park, or street adjacent to or abutting a park (including all public sidewalks of such abutting streets) shall sell, offer for sale, hire, lease or let anything whatsoever, except under and within the terms of a permit, or except as otherwise

provided by law.[1]

Lederman v. Giuliani, No. 98 Civ. 2024(LMM), 2001 WL 902591, at *6 (S.D.N.Y. Aug.7, 2001)

(quoting 56 R.C.N.Y. 1-05(b)). In 2001, a group of artists who made their living selling their

works on sidewalks and public parks in New York City challenged the city rule on the grounds

that its enforcement infringed their constitutional and state law rights. Judge McKenna, granting

summary judgment for plaintiffs, found that the enforcement of the rule against "book and art

vendors" violated a separate provision in the New York City Administrative Code exempting

licensing requirements for book and art vendors. Id. at * 18-19. Therefore, Judge McKenna

found that an exemption for book and art vendors had to be "read into the 'otherwise provided by

law' clause in § 1-05(b)." Id. at 19. In accordance with this opinion, Judge McKenna issued a

permanent injunction (the "Lederman Injunction") enjoining any enforcement of the § 1-05(b)

permit requirement "against any person who sells or offers for sale any paintings, photographs,

prints and/or sculpture, either exclusively or in conjunction with books or other written matter, in

front of the Metropolitan Museum of Art or in any territory within the jurisdiction of the Parks

Department." Lederman v. Giuliani, No. 98-CV-2400 (LMM), Dkt. No. 59 (S.D.N.Y. Aug. 24,

2001).

In response to plaintiff's claim that in 2005 and beyond the City of New York had a

policy of enforcing 56 R.C.N.Y. § 1-05(b) in violation of the Lederman injunction and plaintiff's

constitutional rights, defendants now submit in opposition evidence of the city's enforcement

policies in force at the time of the incident.

---

[1] In 2010, 1-05(b) was amended to exempt from the permit requirement vendors of "expressive matter" except for those vendors using a cart, display stand or other device occupying a certain location for a period of time. Those vendors were subject to more restrictive time, place and manner requirements. For a discussion of the constitutionality of the 2010 revisions see Lederman v. New York City Parks and Recreation, Nos. 10-CV-4800(RJS) & 10-CV-5185(RJS), 2010 WL 2813789, at *3 (S.D.N.Y. July 16, 2010).

Specifically, on February 22, 2002, the Director of Special Events and Permits of the New York City Parks Department issued an internal memorandum clarifying the enforcement guidelines regarding restrictions on public vendors. The memorandum stated that "vendors of exclusively printed material are permitted to distribute it without a permit . . . , vendors of their own artwork are permitted to distribute it without a permit . . . , and these printed material and artist vendors do not require a special permit from Parks." Albano Decl. Ex A. Then, on September 21, 2004, the New York City Police Department issued Operations Order No. 39, titled "Street Vendors who sell First Amendment Protected Items," which set forth guidelines to police officers regarding vendors, stating that a "a general vendor's license is not required for the sale of the following items of visual art," including "street photographers." The order defined street photographers as "vendor's [sic] who take a person's picture in the street and receive a fee in exchange for the immediate delivery of the photograph." Albano Decl. Ex A. The order, posted on the Department's intranet and hard copies of which are maintained at the main desk in each police facility and distributed to each supervisor, directed commanding officers to bring the contents of the order to the attention of their subordinates. See Albano Decl., at ¶ 9-10.

## II. DISCUSSION

For the purposes of this motion, plaintiff asserts causes of action pursuant to 42 U.S.C. § 1983 for violations of his rights under the First, Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution. He further asserts that the City of New York should be held liable for its officers' conduct pursuant to Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978).

### A.    Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a). The function of the court is not to resolve disputed issues, but to determine

whether there is a genuine issue to be tried. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

249 (1986). "While genuineness runs to whether disputed factual issues can reasonably be

resolved in favor of either party, materiality runs to whether the dispute matters, i.e., whether it

concerns facts that can affect the outcome under the applicable substantive law." McPherson v.

Coombe, 174 F.3d 276, 280 (2d Cir. 1999) (quoting Graham v. Henderson, 89 F.3d 75, 79 (2d

Cir. 1996) (internal quotation marks and ellipses omitted)).

   In assessing whether summary judgment is appropriate, the court considers "the

pleadings, depositions, answers to interrogatories and admissions on file, together with any other

firsthand information including but not limited to affidavits." Nnebe v. Daus, 644 F.3d 147, 156

(2d Cir. 2011) (quoting In re Bennett Funding Grp., Inc., 336 F.3d 94, 99 (2d Cir. 2003) (internal

quotation marks omitted)); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The

moving party carries the burden of proving that there is no genuine dispute respecting any

material fact and "may obtain summary judgment by showing that little or no evidence may be

found in support of the nonmoving party's case." Gallo v. Prudential Residential Servs., 22 F.3d

1219, 1223 (2d Cir. 1994). Once this burden is met, in order to avoid the entry of summary

judgment against it, the non-moving party "must come forward with specific facts showing that

there is a genuine issue for trial." LaBounty v. Coughlin, 137 F.3d 68, 73 (2d Cir. 1998). In

reviewing the record before it, "the court is required to resolve all ambiguities and draw all

permissible factual inferences in favor of the party against whom summary judgment is sought."

McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997) (citing Anderson, 477 U.S. at 255).

**B.     Section 1983**

7

Section 1983 does not create a substantive right; rather it creates a cause of action to remedy the deprivation of federal rights elsewhere established. See Thomas v. Roach, 165 F.3d 137, 142 (2d Cir. 1999). It provides that

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured.

42 U.S.C. § 1983. "To state a claim under § 1983, a plaintiff must allege that (1) the challenged conduct was attributable at least in part to a person acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution of the United States." Snider v. Dylag, 188 F.3d 51, 53 (2d Cir. 1999). In addition, the personal involvement of defendants in such conduct is an essential element of a § 1983 claim. Farrell v. Burke, 449 F.3d 470, 484 (2d Cir. 2006); see also Monell, 436 U.S. at 694 (municipality may not be held liable on a theory of respondeat superior).

Defendants do not contest plaintiff's assertion that they were acting under color of state law at all times relevant to the complaint. Rather, defendants argue that many of them had no personal involvement in the events that allegedly violated plaintiff's constitutional rights; that, in any event, none of them violated plaintiff's rights; and, finally, that they are entitled to qualified immunity for any violation that did occur.

1. False Arrest/Duty to Intervene

A § 1983 claim for false arrest requires proof of the same four elements as a claim for false arrest under New York law: (1) the defendant intentionally confined plaintiff, (2) plaintiff was conscious of the confinement, (3) plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged. See Jocks v. Tavernier, 316 F.3d 128, 134 (2d Cir. 2003); Harris v. County of Nassau, 581 F.Supp.2d 351, 354-55 (E.D.N.Y. 2008); Broughton v.

State, 37 N.Y.2d 451, 456 (1975). If probable cause exists at the time of arrest, the confinement is privileged. Jocks, 316 F.3d at 135; Martinez v. City of New York, 340 Fed. Appx. 700, 701 (2d Cir. 2009). Thus, the existence of probable cause constitutes a complete defense to a false-arrest claim. Covington v. City of New York, 171 F.3d 117, 122 (2d Cir. 1999).

"[A]n arresting officer's state of mind . . . is irrelevant to the existence of probable cause." Devenpeck v. Alford, 543 U.S. 146, 153 (2004) (citing Whren v. United States, 517 U.S. 806, 812-13 (1996)). Evaluating whether or not probable cause to arrest exists, therefore, is an objective inquiry. See Whren, 517 U.S. at 813 ("[T]he fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action.") (quoting Scott v. United States, 436 U.S. 128, 138 (1978)). Moreover, the crime identified by the officer at the time of the arrest—or the booking officer— need not be supported probable cause, as long probable cause to arrest existed. Jaegly v. Couch, 439 F.3d 149, 153 (2d Cir. 2006) ("[A] claim for false arrest turns only on whether probable cause existed to arrest a defendant, and [] it is not relevant whether probable cause existed with respect to each individual charge, or, indeed, any charge actually invoked by the arresting officer at the time of the arrest."). The offense establishing probable cause to arrest need not even be "'closely related to', [or] based on the same conduct as, the offense identified by the arresting officer." Devenpeck, 543 U.S. at 154.

In the previous opinion, defendants rested their case for summary judgment on the undisputed fact that at some point, defendant Major related his side of the story of the altercation to the officers at the scene. Relying on the "uncontroversial proposition that officers are entitled to rely on the allegations of crime victims and of fellow police officers in making a probable

9

cause determination, see Martinez v. Simonetti, 202 F.3d 625, 634 (2d. Cir. 2000), defendants argued that Major's allegations supplied probable cause to arrest plaintiff or, at least, made it reasonable to believe that there was probable cause for the purpose of qualified immunity." See Memorandum and Order dated July 18, 2011, Dkt. No. 129. The court agreed that Major's accusations of assault provided probable cause to arrest plaintiff. This court, however, noted that the record, with all inferences drawn in favor of plaintiff, indicated a period of time in which Chepilko had been confined in handcuffs before Major had related his story to any of the officers on the scene. See Williams v. City of Rome, No. 08-CV-14, 2009 WL 2156914, at *3-4 (N.D.N.Y. July 15, 2009) (finding a false arrest where police kept suspect handcuffed in the absence of probable cause until his story could be confirmed). Because defendant failed to put forth any argument that plaintiff's confinement prior to Major relating his side of the story was otherwise privileged, and failed to address the personal involvement of the other individual defendants with respect to this period of confinement, the court denied summary judgment. Defendants now argue (1) that the arresting officers Davis and Rosanelli had reasonable suspicion to briefly detain plaintiff and their use of force including handcuffs was justified under the circumstances; (2) that Officers Kennedy and Burns were not personally involved in plaintiff's arrest; and (3) that Major is not a law enforcement officer and cannot be held liable for false arrest.

> a. *Davis and Rosanelli*

Defendants now argue that to the extent plaintiff was detained prior to Major's complaint, the detention was privileged and justified by the totality of the circumstances at the time the officers came onto the scene. Defendants do not contend that "probable cause" to arrest plaintiff existed prior to Major relating his accusations to other officers. Rather, defendants argue that

under the circumstances defendants had "reasonable suspicion," a lower standard, to briefly detain plaintiff until the physical altercation had been quelled. Then, defendants argue—and as this court previously acknowledged—once Major related his side of the story to the police officers on scene, reasonable suspicion ripened into probable cause and plaintiff's continued detention was justified.

Even absent probable cause to arrest, law enforcement officers may temporarily detain and frisk a criminal suspect (a "Terry stop") upon "reasonable suspicion." See Terry v. Ohio, 392 U.S. 1 (1968). "Reasonable suspicion has been defined as the quantum of knowledge sufficient to induce an ordinary prudent and cautious man under the circumstances to believe that criminal activity is at hand." United States v. Cummings, 764 F. Supp. 2d 480, 504 (E.D.N.Y. 2011). "[W]here an officer has a reasonable basis to think that the person stopped poses a present physical threat to the officer or others, the Fourth Amendment permits the officer to take 'necessary measures . . . to neutralize the threat' without converting a reasonable stop into a de facto arrest." United States v. Newton, 369 F.3d 659, 674 (2d Cir. 2004). Courts have upheld the use of a range of appropriate uses of force incident to a stop, including a frisk, the drawing of firearms, and the use of handcuffs and leg irons, that come short of converting a temporary "stop" into an arrest for the purposes of the Fourth Amendment. See id, at 674-75 (collecting cases); but see United States v. Vargas, 359 F.3d 98, 102 (2d Cir. 2004) ("[U]nder ordinary circumstances, . . . using handcuffs [is] not part of a Terry stop."). While there is no bright-line rule, among the factors often deemed relevant to the reasonableness of the force applied incident to an investigatory stop are: (1) the length of time involved in the stop; (2) its public or private setting; (3) the number of participating law enforcement officers; (4) the risk of danger presented by the person stopped; and (5) the display or use of physical force against the person stopped.

Id. at 674. Of course, "[r]easonable suspicion may develop into probable cause based on events unfolding during an investigative stop." United States v. Brockington, 378 Fed. App'x 90, 92 (2d Cir. 2010).

Viewing facts in the light most favorable to plaintiff, the court cannot find as a matter of law that police officers Davis and Rosanelli had a reasonable basis to think that Chepilko was engaged in criminal activity and posed a present physical threat to the officers or the gathered crowd. Under defendants' view of the facts, Davis and Rosanelli received a report of an arrest in progress and encountered an altercation between plaintiff and Major when they arrived on the scene. According to Major, plaintiff was acting aggressively even after being asked to move away. Major Aff. at ¶ 31. Therefore, defendants urge, Davis and Rosanelli had reasonable suspicion to detain plaintiff until the altercation and aggressive behavior had dissipated.

Plaintiff's account differs substantially. Plaintiff maintains that by the time the other officers had arrived, plaintiff had gotten up from the ground and was using a bystander's cell phone to calmly call 9-1-1. Chepilko Dep. at 58. Plaintiff then told one of the officers to retrieve the Lederman injunction and his identification papers from Major. Id. "Without any warning or explanation," one of the officers—either Davis or Rosanelli—asked for his hand, handcuffed him and pushed him towards the boardwalk. Id. at 59. Construing the facts in the light most favorable to plaintiff, the only circumstances known to Officers Davis and Rosanelli as they arrived on the scene and before detaining plaintiff was that there had been some kind of dispute between plaintiff and Major. However, they did not witness the altercation, they did not have an opportunity to speak to Major, and there is no evidence that they noticed that Major's arm was bleeding. Although the period of handcuffing was brief and in a public setting, a jury could find that the defendants had no "reasonable basis to think that" under the circumstances

plaintiff "pose[d] a present physical threat to the officer or others" justifying the use of handcuffs. Newton, 369 F.3d at 674. Under plaintiff's account, plaintiff was exhibiting no aggression, there were no signs of a physical altercation, and nearly a dozen officers were on the scene. See also Wong v. Yoo, 649 F.Supp.2d 34, 60 (E.D.N.Y. 2009) (denying summary judgment where under plaintiff's account of handcuffing, plaintiff had visible injuries and there was "the lack of any threat of immediate harm" to the officers or others); Williams, 2009 WL 2156914, at *3 (finding seizure and the use of handcuffs unlawful because it was reasonable to believe that an unidentified man leaving a closed story in the middle of the day, without more, was committing a burglary); Gonzalez v. City of New York, No. 03–CV–1260 SJF/CLP, 2006 WL 1995127, at *3-4 (E.D.N.Y. July 14, 2006) (denying summary judgment on false arrest claim where differing accounts of use of force during stop). This is not a situation where it is undisputed that defendants had reason to believe Mr. Chepilko was dangerous or threatening, or exhibited a tendency to flee the premises.[2] See Newton, 369 F.3d at 675 (finding it reasonable for six officers to handcuff suspect while they searched for firearm where report indicated that suspect possessed a firearm, had threatened to kill his mother and her husband, and holding suspect at gunpoint was less safe alternative); Vargas, 369 F.3d at 102 (finding takedown and handcuffing reasonable where officers had a reliable tip that the suspect had a firearm, the suspect ran away from the offices, and the detention before probable cause arose was very brief); Watson v. Cieslak, No. 09 Civ. 2073, 2011 WL 446276, at *4 (E.D.N.Y. Jan. 5, 2011) (finding use of handcuffs justified in investigatory stop where plaintiff admitted "that it was necessary to handcuff him when he 'became very agitated and excited'"); Evans v. Solomon, 581 F.Supp.2d 233, 246 (E.D.N.Y. 2010) (finding handcuffing justified where undisputed that plaintiff was

---

[2] This finding is supported by plaintiff's allegation that nearly a dozen police officers arrived at the scene at the same time.

"very upset" and was pacing on the street in the way of oncoming traffic). The court therefore finds that there is a genuine issue of material fact of whether under the totality of the circumstances it was objectively reasonable to restrain plaintiff in handcuffs prior to Major's complaints.[3]

Because, under plaintiff's view of the facts, there was no reason whatsoever to believe that plaintiff presented any harm justifying his restraint through the use of handcuffs, defendants Rosanelli and David are also not entitled to summary judgment on the basis of qualified immunity. When the evidence is read in the light most favorable to plaintiff, the court finds that no reasonable officer could have reasonably believed that reasonable suspicion existed to detain plaintiff before Major's complaint. See Cerrone v. Brown, 246 F.3d 194, 202-03 (2d Cir. 2001) (qualified immunity available when "a reasonable police officer in the same circumstances and possessing the same knowledge as the officer in question could have reasonably believed that probable cause existed in the light of well-established law") (internal quotation marks and citation omitted). Defendants' motion for summary judgment on plaintiff's false arrest claim is therefore denied with respect to Officers Davis and Rosanelli.[4]

### b. *Officers Kennedy and Burns*

Because the court has found that plaintiff can sustain a claim for false arrest only for the period after he had been handcuffed but before Major related his story to the police officers on

---

[3] The court pauses to note, however, that even if plaintiff's version of the events is accepted in its entirety, any claim for false arrest by Chepilko would likely result in only nominal damages. If the initial detention was justified, the illegality lasted only until Major related his story concerning the altercation to the other officers, since probable cause is based on the collective knowledge of all the officers at the scene. Caraballo v. City of New York, No. 05 Civ. 8011(GEL), 2007 WL 1584202, at *5 n. 7 (S.DN.Y. May 31, 2007) (finding only nominal damages were available where false arrest was brief and lasted only until the moment when the victim related his story to the other officers); see also United States v. Colon, 250 F.3d 130, 137 (2d Cir. 2001) (discussing collective knowledge doctrine). It is undisputed that Major related his story at some point shortly after the offices came to the scene. Any time period in which plaintiff was unlawfully restrained must have therefore been quite brief.

[4] Defendant also argues that Davis should be entitled to qualified immunity because he was only following a superior's order to place plaintiff in handcuffs. The record is less than clear on, and the parties dispute, who actually arrested plaintiff and upon whose orders. Therefore, the court cannot grant summary judgment on this basis.

scene, it stands to reason that plaintiff can sustain a claim for false arrest only against those defendants' personally involved in this brief period of confinement. Personal involvement may be established by a showing of direct participation, or "intentional participation in the conduct constituting a violation of the victim's rights by one who knew of the facts rendering it illegal." Provost v. City of Newburgh, 262 F.3d 146, 155 (2d Cir. 2001). Plaintiff does not allege, nor is there any evidence in the record indicating, that Kennedy or Burns were involved in Chepilko's handcuffing. At most, they were at the scene at the time of plaintiff's initial restraint. Therefore, plaintiff's claim of false arrest against Officers Kennedy and Burns must be dismissed.

Even where there is no direct participation, a police officer may still be held liable under § 1983 for failure to intervene to protect a plaintiff's constitutional rights.[5] "A law enforcement officer has an affirmative duty to intercede on behalf of a citizen whose constitutional rights are being violated in his presence by other officers." O'Neill v. Krzeminski, 839 F.2d 9, 11 (2d Cir. 1988). An officer who fails to intercede is liable for the preventable harm caused by the actions of other officers where he or she observes or has reason to know that those other officers are violating a person's constitutional rights by using excessive force or making an unjustifiable arrest. Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994). However, liability may attach only when, "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." Jean-Laurent v. Wilkinson, 540 F.Supp.2d 501, 512 (S.D.N.Y. 2008) (citing O'Neill v. Krzeminski, 839 F.2d 9, 11-12 (2d Cir.1988)); Cantave v. New York City Police Officers, No. 09-CV-2226, 2011 WL 1239895, at *8 (E.D.N.Y. Mar. 28, 2011).

---

[5] As Rosanelli, Davis, and Major may be liable under a theory of direct participation, there is no claim against these defendants for failure to intervene.

Defendant argues, relying on the affidavits submitted by defendants, that under all factual accounts, Kennedy and Burns were either not present when plaintiff was arrested or the arrest took place with the appropriate probable cause because Major had already related his side of the story to them. Therefore, defendants urge that Kennedy and Burns were either unable to intervene as they were not present, or had no reason to know that plaintiff's constitutional rights were being violated. Under plaintiff's view of the facts, however, the defendant officers were at the scene during the entire course of the arrest. Moreover, and as was noted in this court's previous opinion, the record establishes that a period of time may have existed after which plaintiff was handcuffed but before Major had related his story establishing a basis to arrest plaintiff.

As to Kennedy, however, the court nevertheless finds that summary judgment is appropriate with respect to plaintiff's failure to intervene claim. Under plaintiff's view of the events, Kennedy was at the scene of the arrest when Rosanelli or Davis handcuffed him and brought him to the boardwalk. Chepilko Aff. at 1. Under Kennedy's view of the events, Kennedy did not come onto the scene until after plaintiff had been handcuffed and was being walked over to the boardwalk. Kennedy Aff, at ¶ 5. Importantly, however, plaintiff does not dispute that upon approaching the scene of the incident, Kennedy observed blood on Major's hand. Id. at ¶ 6. At that point it was not objectively unreasonable for defendant Kennedy to believe that Major had been injured by plaintiff and therefore that Rosanelli and Davis had handcuffed plaintiff with either probable cause to believe that plaintiff had committed a crime or reasonable suspicion that plaintiff posed a threat to the officers or surrounding crowd. See Anderson, 17 F.3d at 557 Either Kennedy was at the scene of the arrest of the arrest, observed blood, and could have reasonably believed that plaintiff was being lawfully restrained; or,

16

Kennedy was not at the scene of the arrest but upon seeing Major's bloodied hand reasonably believed that defendants Rosanelli and Davis had lawfully handcuffed plaintiff.

The record is less clear as to Burns. Defendant again points to submitted affidavits stating either that Burns arrived after plaintiff had been arrested and moved to the boardwalk, or that Burns had spoken to Major and heard his side of the story. Under plaintiff's timeframe, however, Burns was with the large group of police officers present at the time of plaintiff's handcuffing and remained as plaintiff was pushed to the boardwalk. Again, there is nothing in the record as to when exactly Burns, or any of the officers present, heard Major's side of the story.[6] Viewed in the light most favorable to plaintiff, there was a period of time in which Burns was present but probable cause had not yet arisen. Unlike Kennedy, however, there is no evidence in the record that Burns observed Major's injury. Absent such evidence, Burns could not have reasonably believed that plaintiff had been lawfully detained before Major related his story. As with Davis and Rosanelli, under plaintiff's view of the facts, plaintiff had exhibited no signs of criminal behavior or aggression. Based on this record, the court cannot conclude as a matter of law that Burns was under no obligation to intervene to prevent the violation of plaintiff's constitutional rights.[7] Therefore, summary judgment is granted only with respect to plaintiff's failure to intervene claim against Kennedy.

      c.  *Major*

---

[6] Though defendant concludes that Burns spoke with Major the moment he arrived at the scene, this conclusion lacks support in the record. Nothing in Burns' affidavit or in defendant's 56.1 statement forecloses the possibility that a period of time existed where Burns was present during the arrest but before Major related his story.

[7] The court notes that the record is devoid of evidence as to the duration of alleged constitutional violation. If the time between plaintiff's arrest and Major's narration of his side of the events to the arresting officers was so brief such that defendants no reasonable opportunity to intervene, plaintiff's failure to intervene claim as to Burns could not survive. See O'Neill, 839 F.2d at 11-12 (finding no failure to intervene claim where excessive force based on repeated physical blows was of such a limited duration that officers failure to intercede could not be viewed as the proximate cause of the beating). Because defendants fail to adduce evidence as to the limited timeframe of the event, the court cannot conclude that there was not a reasonable opportunity for Burns to intervene to prevent the constitutional violation.

Finally, defendants now move for summary judgment for the false arrest claim against Major on the grounds that (1) defendant Major is not a law enforcement officer capable of making arrests; and (2) there is no evidence in the record that Major provided false information to the arresting officers, leading to plaintiff's arrest.

As an initial matter, while it is undisputed that Major is not a law enforcement officer or a peace officer, and Major puts forth in his accompanying affidavit that he <u>has never</u> made an arrest, defendant points to no authority stating he <u>cannot</u> effect an arrest as a Parks Manager. <u>See</u> Def. 56.1 statement at ¶ 15; Major Aff. at ¶ 1. Nevertheless, because plaintiff does not allege, and there is no evidence suggesting, that Major actually participated in the restraint of plaintiff underlying the false arrest claim, defendant cannot be held liable for actually confining plaintiff.

However, "even where there is no claim that a defendant actually restrained or confined a plaintiff, a claim of false arrest or false imprisonment may lie where a plaintiff can 'show that . . . defendan[t] instigated his arrest, thereby making the police . . . agents in accomplishing [defendant's] intent to confine the plaintiff.'" <u>Weintraub v. Board of Educ. of City of New York</u>, 423 F. Supp. 2d 38, 45 (E.D.N.Y. 2006) (quoting <u>Carrington v. City of New York</u>, 607 N.Y.S.2d 721 (2d Dep't 1999). Specifically, a false arrest claim exists when a non-officer instigates the arrest by providing knowingly false information to police. <u>Weintraub</u>, 423 F. Supp. 2d at 55-56. This theory of liability can support a claim not only under state tort law but also under § 1983, where the defendant, even if not a law enforcement officer, is acting under the color of state law. <u>See</u> <u>Rateau v. City of New York</u>, 06-CV-4751 (KAM) (CLP), 2009 U.S. Dist. LEXIS 90112, at *11-14 (E.D.N.Y. Sep. 29, 2009) (finding § 1983 liability appropriate under false arrest claims where plaintiff's theory was that defendant, a city information technology supervisor, falsely reported to police that plaintiff had threatened him, ultimately leading to plaintiff's arrest). Here,

defendants do not dispute that Major was acting under the color of state law. Indeed, Major's interaction with plaintiff "arose solely out of" his position as a Parks Manager and an employee of the city, not out of any personal relationship or as a private citizen. Id. at *13; see also Carlos v. Santos, 123 F.3d 61, 65 (2d Cir. 1997) ("The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with authority of state law.") (internal quotation marks and citations omitted).

The court finds that a genuine issue of material fact exists as to whether defendant Major intentionally provided false information to the police officers on scene resulting in plaintiff's unjustified confinement. According to plaintiff's account of the events leading up to his arrest, their dispute was purely verbal and relatively calm until defendant yelled "keep your fucken mouth shut." Chepilko Aff. at 1. Then after trying to record the event, Major initiated the physical altercation by grabbing plaintiff's camera and "viciously and psychotically push[ing] [plaintiff] to the ground and punch[ing] [his] back" while injuring his knee. Id. By many of the defendants' accounts, Major subsequently informed the police officers that had gathered at the scene that plaintiff had "attacked him" and that he wished to press charges. Defs' 56.1 statement, at ¶¶ 45-46. Indeed, defendants maintain that Major's story furnished the basis for the probable cause to continue to detain plaintiff. Accepting plaintiff's account of the altercation, and defendants' account of Major's narration of the events, a jury could reasonably conclude that Major had intentionally provided false information of the altercation, thereby instigating plaintiff's arrest. Weintraub, 423 F. Supp.2d at 45; see also Rateau, 2009 U.S. Dist. LEXIS 90112, at * 16 (finding that where non-law enforcement officer reported that plaintiff had threatened defendant's personal safety, but plaintiff testified to the contrary, there was a genuine

dispute of material fact as to whether defendant "intended to have plaintiff arrested by making false reports"). Accordingly, the court must deny summary judgment as to the state and federal false arrest claims against defendant Major.

## 2. Due Process

Plaintiff alleges that his due process rights under the Fourteenth Amendment were violated because defendants seized memory cards from his camera at the 60th Precinct but failed to return them. Where plaintiff alleges an "unauthorized intentional deprivation of property by a state employee, [there is no] violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available." Hudson v. Palmer, 468 U.S. 517, 533 (1984). There is no allegation that plaintiff's deprivation was pursuant to an established policy rather than a random, unauthorized act by an individual employee. Furthermore, as defendant points out, plaintiff does not allege, nor is there any evidence in the record that there lacked an adequate post-deprivation remedy. See Lindsey v. Lutz, 10 Civ. 3931 (JSR)(KNF), 2011 U.S. Dist. LEXIS 76646, at *9 (S.D.N.Y. June 16, 2011); Carter v. Kress, No. 83 Civ. 1225, 1985 U.S. Dist. LEXIS 15064, 1985 WL 100, at *1 (S.D.N.Y. Oct. 10, 1985) ("If property is taken by the police . . . and not voluntarily returned to an arrestee, the property owner has two adequate post-deprivation remedies under New York law: a common-law replevin action or, after demand, a proceeding under Article 78 of the [New York Civil Practice Law and Rules]."). Accordingly, plaintiff's procedural due process claims are dismissed.[8]

## 3. Unconstitutional Conditions of Confinement

---

[8] As defendant notes, plaintiff fails to allege or produce any evidence of a substantive due process violation, or conduct so egregious that it "shocks the conscience." See County of Sacramento v. Lewis, 523 U.S. 833, 845 (1998).

Plaintiff's complaint also challenges the conditions of his confinement at the 60th precinct and Central Booking. Plaintiff contends (1) that defendants failed to provide adequate medical care during the course of his incarceration and (2) that defendants failed to provide food or water. The court finds that defendant is entitled to summary judgment on these claims.

When evaluating a claim for unconstitutional conditions of confinement, the court looks to whether the "challenged conditions amount to 'punishment' without due process of law. Cruz v. Reiner, 11 Civ. 2131 (BMC)(SMG), 2011 U.S. Dist. LEXIS 14992, at *13 (E.D.N.Y. Dec. 13, 2011) (citing Bell v. Wolfish, 441 U.S. 520, 435 (1979)); see also United States v. Walsh, 194 F.3d 37, 48 (2d Cir. 1999) (holding that Eighth and Fourteenth Amendment tests that apply to the claims of pre-trial detainees and sentenced convicts, respectively, are essentially the same). This test includes both a subjective component, focusing on the defendant's motive for his conduct, and an objective component, focusing on the conduct's effect on the plaintiff. Wright v. Goord, 554 F.3d 255, 268 (2d Cir. 2009) (citing Hudson, 503 U.S. at 7-8). The subjective component turns on "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Hudson, 503 U.S. at 7. The objective component turns on whether "the alleged wrongdoing was objectively 'harmful enough' to establish a constitutional violation" in light of "contemporary standards of decency." Id. at 8 (internal quotation marks and citations omitted). Although a prison official's use of force to cause harm maliciously and sadistically will always violate contemporary standards of decency, whether or not a significant injury is evident, de minimis uses of physical force do not constitute constitutional violations, "provided that the use of force is not of a sort repugnant to the conscience of mankind." Id. at 9-10 (internal quotation marks and citations omitted).

To establish an unconstitutional denial of medical care, plaintiff must prove that (1) that the alleged deprivation of care was "sufficiently serious" and (2) that the defendants acted with "deliberate indifference." Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1994). Plaintiff offers no evidence in support of either prong. First, as an objective matter, plaintiff's only evidence of medical deprivation consist of his statement in his accompanying affidavit that while at Central Booking, he complained of a headache and knee pain. This conclusory allegation fails to establish a "sufficiently serious" deprivation of medical care as would arise to a constitutional violation. See Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998) ("The standard for Eighth Amendment violations contemplates 'a condition of urgency' that may result in 'degeneration' or 'extreme pain'"). Plaintiff's relatively brief detention while having to endure a headache and knee pain falls well short of an injury of constitutional magnitude. Moreover, there is absolutely no evidence in the record whatsoever establishing that defendants were "deliberately indifferent" to his medical needs. To the contrary, the court notes that after his arrest, defendants promptly brought plaintiff to the hospital for medical care.

Plaintiff also alleges that he was denied food and water in violation of his constitutional rights. The record before the court establishes that plaintiff was not denied food or water. See Chepilko Aff. at 2 (admitting that upon arriving at the 60th precinct, plaintiff was provided a bottle of water and Officer DaSilva's mother's homemade sandwiches). The entirety of plaintiff's complaint appears to be that he was denied bottled water, and given only "unboiled tap water" at Central Booking. Chepilki. Aff. at 2. It goes without saying that pre-trial detainees do not have a constitutional right to bottled (or boiled) water.

Accordingly, plaintiff's claims for unconstitutional conditions of confinement are dismissed.

### 4. Municipal Liability

A municipality may not be held liable for its employees' constitutional violations under a general theory of respondeat superior. Monell, 436 U.S. at 694. "[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." Id. Therefore, in order to impose § 1983 liability on a municipality for the acts of its employees, a plaintiff must plead and prove (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) the denial of a constitutional right. Zahra v. Town of Southold, 48 F.3d 674, 685 (2d Cir. 1995).

The City argues that plaintiff has failed to come forward with sufficient evidence of a municipal policy or custom to maintain a § 1983 claim against it. "A plaintiff may prove a municipal policy or custom by showing that: (i) the employees' unconstitutional acts are officially sanctioned or ordered by the municipality; (ii) the existence of a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; or (iii) the unconstitutional acts were by individuals with final policymaking authority." Porter v. City of New York, No. - 03-cv-6463, 2007 WL 1791149, at *7 (E.D.N.Y. June 19, 2007) (internal quotation marks omitted) (citing City of St. Louis v. Praprotnik, 485 U.S. 112, 123 (1988); Pugliese v. Long Island R.R., No. 01-CV-7174, 2006 WL 2689600, at *3 (E.D.N.Y. Sept. 19, 2006)).

The lone surviving theory on which this court found plaintiff might support a theory of municipal liability was based on plaintiff's allegations that a de jure municipal policy was embodied in 56 R.C.N.Y. § 1-05(b), which City employees routinely enforced against photograph vendors in violation of the permanent injunction in Lederman v. Giuliani. Plaintiff

23

supports this theory with five dismissed summonses he received in 2008 and 2009 for vending photographs. Plaintiff further contends that he has settled three federal lawsuits for First Amendment violations. Finally, the incident on July 2, 2005 itself, plaintiff maintains, supports the argument that the officers enforced the vending permit rules against plaintiff pursuant to an established policy. The complaint and arrest reports both explicitly state that plaintiff was taking and selling photographs "in violation of Park Regulations." Further, Major and Howell admit that they believed plaintiff was not permitted to sell photographs on the beach and had warned him against doing so prior to July 2, 2005. Major Aff. ¶ 6; Howell Aff. ¶¶ 6-7. Because defendant merely argued that the summonses could not establish an official policy or custom on which municipal liability may be based, and did not address whether the 56 R.C.N.Y. § 1-05(b) established an official written policy that caused plaintiff's denial of a constitutional right, this court denied summary judgment in its previous order. Defendant now adduces evidence in support of its argument that, contrary to plaintiff's theory, the city's enforcement policies expressly instructed police officers and park officials that vendors of expressive material—and specifically photo-vendors such as plaintiff—must be permitted to sell without a permit.

First, defendant submits that no express written policy in violation of the Lederman injunction existed on July 18, 2011. Defendant cites 56 R.C.N.Y. § 1-05(b) which currently reads that "persons may vend expressive matter . . . on property under the jurisdiction of the Department without a permit . . . [and] expressive matter vendors are subject to vending in certain designated spots . . . unless they are only vending expressive matter without a car, display stand or other device . . . ." 56 R.C.N.Y. § 1-05(b)(2). This revised rule, however, was not in effect until July 2010, five years after the alleged incident. Between the issuance of the injunction and July 2010, 56 R.C.N.Y. § 1-05(b) and its general prohibition against vending

without a permit remained in the City Rules. The injunction and the opinion issued by Judge McKenna in the Lederman case, however, made clear that expressive vendors were exempted from the permit requirements under the "otherwise provided by law" clause. In other words, Judge McKenna expressly held that the rule was facially constitutional, but interpreted it not to apply to book and art vendors. Mckenna, 2001 U.S. Dist. LEXIS 11567, at *15-17. The rule itself, therefore, at least as interpreted by Judge McKenna does not constitute a de jure municipal policy likely to result in the violation of plaintiff's constitutional rights even prior to the 2010 revisions. Though a facially constitutional policy may still give rise to municipal liability, plaintiff must establish that it was promulgated with "deliberate indifference" to the known or obvious consequence that constitutional violations would result. Dawson v. County of Westchester, 351 F.Supp.2d 176, 195 (S.D.N.Y. 2004); see also Burge v. St. Tammany Parish, 336 F.3d 363, 370 (5th Cir. 2003). As is set forth below, the city's post-Lederman promulgation and distribution of policies explicitly designed to comply with the injunction demonstrate that the city was not "deliberately indifferent" to likely constitutional violations.

Rather, in direct response to the Lederman injunction and similar rulings, the Director of Special Events and Permits issued a February 2002 memorandum clarifying the guidelines regarding restrictions on vendors. The memorandum stated that "vendors of exclusively printed material are permitted to distribute it without a permit . . . , vendors of their own artwork are permitted to distribute it without a permit . . . , and these printed material and artist vendors do not require a special permit from Parks." Albano Decl. Ex A. While perhaps not directly responsive with respect to photo-vendors like Mr. Chepilko, the New York City Police Department subsequently cleared up any possible ambiguity. On September 21, 2004, the Department issued Operations Order No. 39, titled "Street Vendors who sell First Amendment

Protected Items," which set forth guidelines to police officers regarding vendors, stating that "a general vendor's license is not required for the sale of the following items of visual art," including "street photographers." The order specifically defined street photographers as "vendor's [sic] who take a person's picture in the street and receive a fee in exchange for the immediate delivery of the photograph." Albano Decl. Ex A.[9] Contrary to plaintiff's contention, the parks memorandum and police order together demonstrate an explicit enforcement policy adopted by city policymakers to enforce permit requirements in accordance with the Lederman decision.[10]

Having disposed of plaintiff's allegation that the city had an official written policy of unlawfully enforcing §1-05(b) against art vendors, plaintiff's claim of municipal liability relies solely on the specifics of the July 2 incident and the subsequent summonses enforced against him personally which he alleges establish a well-settled custom or practice amounting to a municipal policy. A municipality may be held liable where a custom "'was so persistent or widespread as to constitute a custom or usage with the force of law.'" Green v. City of New York, 465 F.3d 65, 80 (2d Cir. 2006) (quoting Patterson v. County of Oneida, 375 F.3d 206, 226 (2d Cir. 2004)). The practice, however, "must be so manifest as to imply the constructive acquiescence of senior policy-making officials." Green, 465 F.3d at 80 (quoting Sorlucco v. New York City Police

---

[9] This is unlike the circumstances in Chalmers v. Los Angeles in which the Ninth Circuit held that vague and conflicting regulations, the enforcement of which could result in predictable violations of constitutional rights, could support a cause of action for municipal liability. 762 F.2d 753 (9th Cir. 1995). In that case, one provision flatly banned all vending activity in a broad area of the city whereas the other provision permitted a vendor to sell from a pushcart under certain circumstances; the regulations were therefore in direct conflict. Id. at 755. Here, the pre-revision rule § 1-05(b) and the enforcement policies of the city Parks and Police departments were not in conflict. Rather, as Judge McKenna held in Lederman, the caveat clause in § 1-05(b) must be read together with the New York Administrative Code to exempt expressive vending.

[10] This conclusion comports with Judge Sullivan's observation in the recent challenges to the 2010 revisions, that since the 2001 Lederman decision, "expressive-art vendors were generally free to sell their wares on sidewalks and in parks throughout the City, subject only to limited regulations that, for example, prohibit vendors from setting up displays on top of subway grates or leaning anything against trees or park benches". Lederman v. New York City Parks and Recreation, Nos. 10-CV-4800(RJS) & 10-CV-5185(RJS), 2010 WL 2813789, at *3 (S.D.N.Y. July 16, 2010) (citing 56 R.C.N.Y. § 1-05(b)(4)).

Dep't, 971 F.2d 864, 871 (2d Cir. 1992)). Plaintiff has failed to adduce sufficient evidence to establish of widespread or persistent custom and practice to reach the jury.

Other than subsequent conduct—a series of five dismissed summonses for unlawful vending he received in 2008 and 2009—plaintiff can only rely on the single incident on July 5, 2005. As the Supreme Court stated in Oklahoma City v. Tuttle,

> Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell,* unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker. Otherwise the existence of the unconstitutional policy, and its origin, must be separately proved. But where the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the "policy" and the constitutional deprivation.

City of Oklahoma City v. Tuttle, 471 U.S. 808, 823-34 (1985). To establish the existence of a municipal custom or policy on July 2, 2005, plaintiff proffers 5 summonses improperly issued and dismissed in 2008 and 2009; three or more years after the incident. Subsequent or contemporaneous conduct can be circumstantial evidence of the existence of preceding municipal policy or custom. See Jones v. Town of East Haven, 493 F.Supp.2d 302, 331-332 (D.Conn. 2007) (holding that subsequent conduct "is probative for purposes of showing the existence of a municipal policy or custom"); see also Bordanero v. McLeod, 871 F.2d 1151, 1167 (1st Cir. 1989) ("Post-event evidence can shed some light on what policies existed in the city on the date of an alleged deprivation of constitutional right"). [11] Here, plaintiff alleges only

---

[11] Defendant urges the court to ignore contemporaneous or subsequent conduct entirely, citing Connick v. Thompson, __ U.S. __, 131 S. Ct. 1350, 1360 n. 7 (2011). In Connick, the Supreme Court in a footnote dismissed as irrelevant evidence of contemporaneous or subsequent conduct in a "failure to train" case because such conduct could not "provide notice to the cit[y] and the opportunity to conform to constitutional dictate." Id. (quoting Canton v. Harris, 489 U.S. 378, 395 (1989)). In a failure to train context, where a "municipality's culpability for a deprivation of rights is at its most tenuous," the key determination is whether the municipal actors were "on actual or constructive notice that a particular omission in their training program" causes constitutional deprivations. Id. at 1359-60. Where the relevant inquiry is notice, subsequent or contemporaneous conduct would therefore not have probative value. Where, however, the plaintiff alleges an actual, albeit informal, policy, subsequent conduct can be circumstantial evidence of the existence of a preceding municipal policy or custom. See Dejesus v. Village of

27



5 isolated instances over a two year period, all of which significantly post-date the incident and are only minimally, if at all, probative of the existence of a municipal policy of unlawful enforcement in effect in July 2005. At most, plaintiff's submitted evidence establishes that several individual officers, despite the enforcement policies communicated within their departments, were either confused about or flagrantly disregarded the rules concerning vendors in public places. Plaintiff, however, offers no evidence that a widespread or persistent custom in violation of plaintiff's constitutional rights had emerged as of July 2005. Such sparse individual instances of unlawful conduct by enforcement officers, without more, fails to establish a practice "so manifest as to imply the constructive acquiescence of senior policy-making officials." Green, 465 F.3d at 89; see e.g., Curry v. City of Syracuse, 316 F.3d 324, 330 (2d Cir. 2003) ("[A] municipality may not be held liable under § 1983 simply for the isolated unconstitutional acts of its employees."); Escobar v. City of New York, 765 F.Supp.2d 415, 420 (E.D.N.Y. 2011) (finding "a handful of isolated incidents insufficient to create a material fact in dispute about the existence of any seizure-related policy"); Dettelis v. City of Buffalo, 3 F. Supp.2d 341, 348 (four unconstitutional strip-searches in addition to the incident in question in seven years failed as a matter of law to constitute a custom); Edwards v. City of New York, 03-cv-9407, 2005 U.S. Dist. LEXIS 34376, at *33 (S.D.N.Y. Dec. 19, 2005) (Monell "would be rendered sterile if, as plaintiff asserts, mere conclusory allegations of a few isolated incidents . . . were sufficient to hold the municipality liable"); but see Okin v. Village of Cornwall-on-Hudson Police Dep't, 577 F.3d 415, 440 (2d Cir. 2009) (finding twelve incidents over a fifteen month period where high-ranking officials failed to adequately respond to serious complaints of domestic violence to constitute an unconstitutional policy). Particularly in light of the evidence offered by defendants establishing that the City took affirmative steps to clarify its enforcement practice with respect to

Pelham Manor, 282 F.Supp.2d 162, 175-76 (S.D.N.Y. 2002).

expressive art vendors, the court finds that plaintiff fails to establish a pattern of practice sufficient to constitute a municipal policy under <u>Monell</u>. To the contrary, even construed in the light most favorable to plaintiff, any misconduct on the part of the officials in enforcing the vendor permit restrictions appear to be the result of either the mistakes or the deliberate misconduct of the individual officers. [12]

## III. CONCLUSION

For the reasons set forth above, defendants' renewed motion for summary judgment is granted in part and denied in part. Defendant City of New York is dismissed from the action, and plaintiff's claims unconditional conditions of confinement and due process violations are dismissed as against all defendants. Plaintiff's claim for false arrest is dismissed as to defendants Kennedy and Burns and plaintiff's claim for failure to intervene is dismissed with respect to Kennedy. Plaintiff's remaining claims may proceed to trial in accordance with this opinion. The parties are directed to appear before the court for a conference on Thursday, February 16, 2012, at 10:30 p.m. in Courtroom 8C.

SO ORDERED.

/Signed by Judge Ross/

Allyne R. Ross
United States District Judge

Dated:     February 6, 2012
           Brooklyn, New York

---

[12] Alternatively, plaintiff also comes up short in establishing causation. Plaintiff must establish "a causal connection between the policy at issue and the unconstitutional acts committed by the municipality's agent." <u>Dejesus v. Village of Pelham Manor</u>, 282 F.Supp.2d 162, 175 (S.D.N.Y. 2003). The subsequent conduct alleged by plaintiff is not probative of whether the individual officers' misconduct at the time of the incident was because of a municipal policy, or merely because the individual defendants misunderstood or deliberately misapplied the law.

29

SERVICE LIST

Pro Se Plaintiff
Sergei Chepilko
501 Surf Avenue
Apt. 13-A
Brooklyn, NY 11224